Thuy Joseph
4536 N. Torridon Way
Boise, Idaho 83702
Phone: 208-863-9667

Plainfiff

U.S. COURTS

MAY 2 5 2012

Rcvd___ Filed___ Time 3:30
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

# UNITED STATES DISTRICT COURT

for the
_____ District of Idaho_____

Thuy P. Joseph_____ )
*Plaintiff*

**12 = 267 = C V  MHW**

Civil Action No.

v.

Complaint

Boise State University and Idaho Human Right Commission   )
*Defendant*

I was a student at Boise State University from 2005- 2011. I just graduated with Bachelor of Science in May 2011. Some professors often called me, Mary. During my last two years of school at Boise State University (Abbreviate-BSU), the treatment was discriminatory, humiliating and profound unlawful from:

1.      Professor Osgood- Pathophysiology class (Abbreviate- HLTHST 300) in the fall semester of 2009, and Vice Provost-Sharon McGuire was retaliatory against me when I came to file complaint at her office Feb- August 2010.

2.      Professor Hannah Lee- Epidemiology class, HLTHST 480 in fall semester 2010, and the chair of department, Sarah Toevs was retaliatory against me when I came to her office in January 21, 2011.

3.      Unable to obtain my internship credits because my adviser, Glenda Hill "forgot" (her word) to sign and handed my internship paper in appropriate time.

**1.    Summary of pathophysiology - HLTHST 300 from Professor Osgood:**

A.  I enrolled in a class in Pathophysiology from Professor Linda Osgood during fall semester 2009. I was the only Asian in class. The HLTST 300 class was a hybrid class that included part of online study and part of attending class lecture. This class required us participated the online discussion section and attended the class in order to earn 10 percent of grade. (Stated in her syllabus). Additional, the class scheduled for eight exams, from which 90 percent of the grade was earned. Professor said that she opened the online discussion section before each exam, so the class participated for any discussion in thread. Before took first exam on September 14-15, I studied her lecture notes and specific materials from the book that she assigned to class. During studying, I found the conflict of information between her lecture notes and the book. I was confusion with this info, so I posted my question on discussion thread to see anyone can help me out before I took first exam. It was shock and surprise for me that the discussion thread disappeared, and the online section shut off for the rest of semester. Even now I did not know what info was correct, let alone what happened for thread or online section.

B.  I took the first exam without knowing the correct information of my posted question. After submitted my exam through online, it indicated on my blackboard that I missed six questions. I was curious to know what missing and wanted to learn to avoid for other exams. I stopped by Professor's office during office hours on the next day. Professor's office hours were right after lecture class Mon-Wed-Friday from 10:40-11:30 am. (Please see Syllabus enclosed) Professor and I looked through my exam questions at her desk. I saw four questions that the answer keys were not clear as it indicated in the book. I expressed to Professor. Professor wrote four questions down on her yellow sticky notepaper, and Professor Osgood promised that she would get back to me later. I mentioned to Professor that, luckily, I had the book with me in my backpack and knew materials were. It would not take long time to find. Professor said that she would get back to me later. There was no student waiting for her assistant, it was only me at her office. Even though I stopped by her office many times for demanding the answers, Professor Osgood made many excuses for not having time and too busy to look at my questions. Professor Osgood also yelled and screamed at me from time to time when I asked her if she had time to look at my questions during the semester. Three months of semester went by; Professor never gave me her answer on my first exam questions on September.

C.  On the next day of lecture class, after we all took second exam (Sept 24-25) online, Professor Osgood announced in the front of the class that students found the answer keys of second exam were not corrected. Professor said she would correct and gave credits for it. Professor then turned to look at me and announced very loud *"Mary, I did not have time to answer your questions yet. I will answer your questions later."* At the end of the class, I came up to her desk and asked the reason why she was not responded to my question yet but responded to other students

2

who asked at later time. Professor just shrugged her shoulders. Professor responded immediately to other students who brought up a similar confusion key answers on the exam as I did in early. Professor Osgood was discriminatory and humiliating me in the front of class.

D. Third exam on October 11-12, my family and I had H1N1 virus, also known as Swine flu. I sent her an email on Monday at 9:51 am to request reschedule for exam *"...through the weekend, I have a high fever, headache and very weak. I try to study for the test #3, but I am concerning for not doing well during my current headache. I wonder may I take the test later when I feel better. I will absence class this morning. Thanks. Sorry for asking this, but this is just happen to us."* I did not see her respond all day. This was my first time ever at the university to request reschedule exam. I was so concerned and waited until 8 pm (11:00 pm deadline time) without seeing her response, so I took exam for 60 minutes. The result was worst. I came to her office during office hours in the following days or so. I asked if Professor received my email, Professor Osgood responded that she was back to her office on Monday morning and did see my email as well as many other students' email for requesting to reschedule exam. Professor said her class allowed dropping one exam and this one was mine to drop. I told her it was not fair for you to respond and allowed other students to reschedule exam but rejected mine. Professor shrugged her shoulders. A day later, I saw Professor posted third exam on blackboard for allowing other students to re-take exam. It was right up to the day of posting fourth exam (7-10 days later). At the same time that week, my professor at different class allowed me to reschedule exam at later time. My other professor told me that President of BSU requested all professors allowed students to reschedule exam even without requesting the letter of evidence from doctor during that intensive flu period.

E. Weeks went by, I still did not have the answers from Professor, even I stopped by her office many times. One day during my visit to her office, Professor said she would do something for me at the end of semester. I questioned about it, but Professor said, "don't worry, Mary. Will figure out something." I was no longer stopping by her office. I searched for help with other students in the class. One classmate shared about her struggling to learn material in Professor Osgood class, and she advised me to attend the satellite Pathophysiology 300 class from Professor Carnosso on Thursday evening class as she did. We all struggled to find time to attend both Pathophysiology class in weekly. Other classmate knew and sent me an online website Echo 360 lecture from Professor Carnosso to study the same material but without having to attend her evening class. In syllabus, Professor Osgood required students to attendant her lectures for earning credits, that was reason classmate and I all had to attend Professor class for hoping to earn ten percent of credits. At each day before or during her lectures, Professor passed the list for everyone to sign for evidences of attending her class throughout the semester. However, at the end of semester, Professor Osgood did not follow her syllabus with applying ten percent credits for attending/ participating. Even I mentioned about it; Professor said she did not follow her syllabus. I had to spend

**3**

so much time in emotional distress to meet the chain commanders at BSU in order for them to change my correct grade as it indicated in her syllabus. It showed Professor did not comply with the university's rule and policy.

F.  By November month, I did not want to stop by Professor's office anymore. Instead, I sent Professor email to request the answer keys of exam #5 and #6 before thanksgiving holiday break. Professor responded by email that she just opened exam 6 but could not open exam#5 because her computer had problem and promised to open later after she fixed her computer. However, she never posted it, and now BSU stated in their statement through response to Idaho Human Right Commission (IHRC) March 1, 2012 stated, "...*Ms. Osgood posted test 6 but could not make test 5 immediately available because one student still had not taken it...*" It was completely conflict with Professor's email to me in November 19, 2009 stated, "*You should be able to view the answers to test 6. I am having difficulty with test 5. As soon as I can make it available I will let you know. Linda*". Another example, Assistant Dean, Pamela Springer wrote to Professor Osgood on September 1, 2010 that I obtained a copy from Ms. Buser during meeting with her in September-October month, "*...As we discussed, it is essential that faculty follow their syllabus and that faculty respond to student concerns in a timely manner...At your last meeting with Mary, a statement was made by you to the effect that you would change Mary's grade contingent on Mary "moving on" with the issue. You explained to me, your intent of asking Mary to "move on" with the issue...*" No one I met early would admit and take responsibility to correct and solve issue at the BSU chain commanders. They all told me to "move on", until I came to meet with Director of Affirmative Action, Ms. Buser who required Dr. Springer to take action. Dr. Springer knew that Professor Osgood broke the university's rule and policy but Dr. Springer and the Chair did nothing or take any action to prevent further of mis-behaviors from Professor since I first came to the faculties and administration offices in January. That was why under pressure from Ms. Buser, Dr. Springer sent Professor to take two online cross-cultural classes in Sept-October 2010 because of my "*non-native English speaker*" (her words in email) reason instead of sending Professor in training for ethical classes that Professor needed as in her statement indicated. Moreover, in BSU statement on January 25, 2011, the university promoted Professor to become tenure in March 2011. It is a few of many examples that BSU now stated untruth information and try to cover and protect faculties of wrongdoing. It is unlawful.

G.  On Monday, December 7 after took our exam # 7, Professor announced in the class that similar to exam 2 that other students found the incorrect in one of key answer question. Profession responded to other students immediately on the next day after exam, but my questions on the first exam were still not answered. Professor just promised for responding in the end of semester, because she was busy and did not have time for my question. It showed again, Professor Osgood treated me different from other students in class. Professor did not comply with the university's professional and ethical behaviors and in the United State education system as a whole.

**4**

H. The last week of fall semester, I still did not have any answer from Professor about my questions on the first exam as well as seeing her posting the key answers of exam 5. I stopped by her office after lecture class ended. I waited at her office for long time but did not see her back to her office. I walked up the stairs and saw her walking down. I walked beside her and asked her about my confusion on how to calculate the final grade. Professor started angry and yelled at me" *I have a meeting; I can't talk with you right now. Whatever grade you had, it was your final grade.*" I mentioned about her syllabus and Professor responded back that she "*did not use that way*".

I. After semester ended, I sent her email on December 15 to request meeting with Professor Osgood to solve these issues together. Once again, Professor replied, "*I am actually in and out of the office, and don't have time to meet...*"Professor also sent me an email to state my final grade of B+. On December 27, I sent her email with expression that" *I thought we should solve this problem together, but you seem don't like solve it with me. I have to let President of Boise State University involve in this issue.*" Right after sending her an email, my class of Pathophysiology on blackboard was gone and replaced by my HLTHST 207- nutrition class that I took in previous semester. In addition, my bronco web with my adviser name of 4 years, Glenda Hill was deleted and replaced by Erin Colburt. This change caused my adviser Glenda Hill upset me during my appointment with her in January 2010 for academic advice. It also had negative impact on my graduate application when Glenda Hill was my recommendatory. (Please see more details in below and enclosed) I spent my holidays in nightmare and emotional stress.

J. The university assumed on Jan 5. I came to Student Information Office for finding information to where I would file complaint. The Student Info Office gave me wrong email and phone number with no one responded to my message. On January 7, I walked right into President of BSU office, Bob Krustra. I met Ms. Sandy Lee in the front desk. After hearing my story, Ms. Lee told me to follow the university rule by meeting these faculties from January to November 2010:

K. Sarah Toevs, chair of the Department of Community and Environment Health

L. Pamela Springer, Associate Dean- School of Nursing

M. James Girvan, dean College of Health Sciences

N. Sharon McGuire, vice-provost for undergraduate studies

O. Blaine Eckles, director-Student Rights and Responsibilites

P. Leslie Webb, Assistant vice president for student affairs

Q. Jane Buser, Director –HR Affirmative Action

R. On January 7, 2010 Ms. Lee called and made an appointment for me to see the Chair. I met Sarah Toevs an hour later in her office. After hearing about my complaint, the Chair commented about Professor's behaviors were not accepted such as the University's rule was not allowed professor to shut down the student's blackboard immediately right after the final exam; and the classes on my blackboard should be up until couple weeks after posting final grade; Professor treated unequal between students in the class. At the end of meeting, the Chair said she needed to meet Professor Osgood and "brainstorm" (her words) to find

**5**

solution. We started to have a little chat. The Chair then shared with me the story of her bother just got back from visiting Vietnam. We talked about Vietnam and the Chair then commented about my good English spoken language, and asked me how and why I get here. We talked an hour in her office and had good conversations. I thought she was nice person like many people I met in Boise. Often, we strike for conversation with topic about my Vietnamese and Vietnam. I never thought at later on the Chair as well as Associate Dean said I was mis-communication and made excuse for reason of different culture. It was completely out of the truth. (I wish I record our conversations at her office, but who would think in a million years that I need to spy and record Professor's conversations in education environment)

S.   However, a day later, the Chair sent me an email with saying *"I shared your concerns and perceptions with her. Specifically we talked about course protocols related to exams, changes to the course syllabus, and use of office hours. She recognized that the course had not gone as well as it has in the past and has already begun to make significant changes in the organization and structure of the class. This was the first semester Linda had used some of the Blackboard testing tools such as allowing students access to exam reviews and it was a steeper learning curve than she expected... Linda is recognized as one of the best teachers in the department and college..."* Evidence showed the chair became defending Professor and fault promise. Professor Osgood announced in the class at the beginning of fall semester 2009 that this class was her fourth year of teaching Pathophysiology 300. It also confirmed in BSU statement on January 25 2011 that Professor taught for nine years at Health Science. Another example showed the chair as well as department of Health Science did not use my complaints to make significant changes in the organization and structure of the class as she claimed. Evidence showed by the story of my summer classmate, Nhi Nguyen who confused about Professor Osgood syllabus after changing from my class 10% credits for participating/activities/attendant to 10% credits pass or fail in Nhi's class during Spring semester 2010. Nhi sent an email to Professor Osgood in the end of semester about her confusion of how Professor determined who pass or fail to receive 10% credits. Professor Osgood asked Nhi *"if she planned to take any class from Professor Osgood in future"*. Nhi responded no, and Nhi received higher grade in Broncoweb than she earned. Her grade was higher than other student/girl (B-) who worked as a team with Nhi throughout semester.

T.   I went back to see Ms. Lee and let her knew about the meeting and emails from Sarah Toevs. Ms. Lee directed me to contact the Dean of Health Science office for further filing complaints. I called the Dean office and his secretary, Anita, told me I needed to see Associate Dean, Dr. Springer first before I could see Dean. Anita said that Associate Dean is Dr. Springer, and I even called the assistant of Associate Dean and she confirmed that Dr. Springer is Associate Dean of Health Science. It conflicts with Sharon McGuire's email on August 2010. (Describe below)

U.   I met Dr. Springer first time on January 12 and told her my complaints about Pathophysiology class issues as the same I did with the Chair. Dr. Springer

6

suggested me to bring the written statement to the next meeting with four of us-Professor Osgood, the Chair and me on January 22, 2010. I brought my written questions (Please see in the attachment) to the meeting. Before we even started the meeting, Dr. Springer copied my two pages written to everyone. I thanked her for putting this meeting together at the beginning of our meeting. Dr. Springer started reading one question at a time for Professor Osgood answered, and Dr. Springer blurted out her comments after reading each question such as her unequal treatment, not consistence with her syllabus and blackboard/broncoweb issues. Professor Osgood sat quietly and could not even answer one question. I remember vivid that in the meeting, the Chair observed everyone and only asked me one question about why I thought professor Osgood changed my adviser name to Erin Colburt in my broncoweb. My response at that time was that if professor did not change my adviser name on broncoweb, so who deleted my health science 300 and replaced my health science 207 that I took in previous semester on blackboard on December 27 after I sent email to professor Osgood saying that if she did not want to deal direct issues with me I had to let president of BSU involved. These things happened right after I sent her email. I turned to ask professor Osgood why I could not access to my health science 300 forever from the day December 27. The Chair turned to professor Osgood and waited for her answers but professor Osgood could not say a word and speechless. That was awkward moments silent in the room, and then Dr. Springer directed telling professor Osgood to arrange meeting with me at her office for discussion my written questions. I agreed with Dr. Springer statement in 'Meeting with Mary Joseph Jan 22, 2010", "...*Mary thanked us for meeting with her and we thanked Mary for being willing to come and meet about her experience. I asked Mary if she had written out what she wanted out of this meeting. She said yes...*", Dr. Springer did not state completely about giving a copy of my two papers question to Professor, the Chair and herself before Dr. Springer even sat down for starting our meeting. Dr. Springer handed back my original papers. I was very calm and comfortable feeling in the meeting with few faculties in the room, because I used just to meet one in one at their office and later they bent the information and their words without the truth that we discussed during face to face meeting at their office. It makes me more frustration and upset. Dr. Springer's information was completely untruth and I never heard before such as "... (*Linda) said she was very busy with students lined up at her door. She got busy and just did not give Mary a response. Linda said she was wrong and again apologized. Then Linda said she thought Mary just wanted to have her test re-graded so never focused on giving Mary the answers...Pam asked Mary to please show us her written explanation of what she wanted. Mary provided us with the document.*" I swear under oath of the United State of America that there was never had any students lined up at her door during I came to her office for asking questions. I could say couple of times I saw another faculty in Professor's office and whispered softly with Professor at her desk. Once time, I had to wait for a half hour outside Professor's office and finally I left. I then sent an email to Professor about "seeing her busy". If we believe Dr. Springer's

statement that Professor thought I just wanted to have her test re-graded, so did Professor ever responded to her thought of re-grade my test. In addition how about her yellow sticky note that Professor wrote my four questions down on September and Professor brought it back on the last meeting for re-calculation my grade. What was on her sticky note? It was conflicts between faculties info. Obviously, the above statement from Dr. Springer was untruth.

V. We walked to the hallway outside Dr. Springer's office. Professor Osgood cried and said she heard all my concerns all semester long, but did not care at that time. Professor said in tears that if she "could turn the clock back, she could treat me differently" (her words), and made other excuse that her dog passed away and lost sleep last night. I asked her why she often snapped, scream and angry with me when I came to ask her about my questions on the first exam that she promised but never gave me her answers. Professor responded "just at later semester" (her words). Professor then said she would resign and no longer to teach Health Science 300 in the future. The true was that professor still taught the same Health Science Pathophysiology class in the following semesters-Spring Semester 2010 (during the time I filed complaints) but in internet model versus traditional class that professor announced in front of class at the beginning of fall semester 2009, and her fourth years of teaching Pathophysiology. This was showing, the Health Science of College and university try to cover and protect professor of wrongdoing even professor said she admitted and wanted to resign and no long teaching pathophysiology.

W. Professor Osgood arranged our meeting again on Thursday January 26, 2010 at 4:00pm- the first week of spring semester 2010. Professor said she had something to do at 4:30 and I let her know I had a class on other side of campus at 4:40 pm. We all agreed the day and time. I came to her office on Jan 26, Professor took out her calculation and the yellow sticky note that she wrote down my four questions last September 2009 during my first time visited her office. (I recognized that sticky note) Professor started calculation of my total points. The professor announced I had 90.5 % and it meant A minus, she explained. Then professor said, she had regretted about her behaviors and treated me during the semester and now she wanted to give me grade A with a condition "if I no longer confronted her any further." (her words) Professor said she wanted to make sure I promised to accept her condition before she could tell Dean of department to change my grade to A. I noticed the clock in her office indicated few minutes pass four. I said it was late for my HRM 305, I needed to attend my class for first week of semester because professor's policy that if any student did not show up for the first week of class, professor had the right to kick student out of her class. It was also the university's policy. Professor was nervous and yelled at me to promise with her (It was similar when I came to her office during semester for asking questions) I walked out her office without saying anything. I did not angry and storm out her

8

office as BSU stated in their response to IHRC. BSU's statement did not make any sense at all. It was professor continuously angry and yelled aloud at me after I stepped out her office. Even I stepped out her office; I could still hear her yelling voice. When I got to the class, it was late. The class was full and overcrowded. There were more students than the table could hold because of long waiting list of students wanted to attend class but there limited space for class. I found the chair on the corner of the room and took my quiz on my laps. I was shaking and in emotional shock. I could not perform my quiz well. It was worst and scaring for me. I could not concentrate to study with all my classes in spring semester that I register and dealing with this complaint at the same time. I dropped all classes except two. My graduate was delay again.

X.  Somehow, on the next day (Friday Jan 27), Dean of Department of Health Science, Dr. Girvan told me that I did not agree with Professor to change my grade to A vs. B plus as previous recorded in my broncoweb. I explained about "her condition" that Professor wanted me to promise with her for not confront any further during the meeting, so I left her office without promise. Dr. Girvan said I needed to "move on" and imposed me a three-day weekend decline to accept his condition by Monday Feb 1 at 5:00pm or contacted Mr. Blaine Eckles, in the Office of Student Rights and Responsibilities to file a grade change appeal. I did not accept Dean's solution.

Y.  When I met Sharon McGuire at her office, Sharon McGuire was retaliatory against and disrespected me when I came to her office in February-July. My first arrangement meeting with Sharon McGuire was on Feb 4, 2010. We confirmed the meeting by emails "How about 3:30 on Tuesday? Sharon." My response was "It is great. Thanks." When I came to vice provost's office, I met Judy Wauer, Vice-provost's assistant. Judy directed me to the chair nearby her desk for waiting vice-provost showed up. I sat there and waited for a while; there were no words or sight from vice-provost. Then suddenly, Judy turned to me and said that vice-provost was not here and I was mis-communication for this meeting. I was so upset and opened vice-provost's email from my phone to show Judy that I did not mis communication and did not want her to blame on me for mis-communication. I let Judy read our emails of confirm this meeting and Judy was speechless. We all sometime appreciate technology! I waited in vice provost's office for a half hour and vice-provost was nowhere to see. Finally, Judy told me that she would let vice provost know and vice-provost would contact me later. We arranged second meeting and I explained my complaints just as I did early with the Chair, Associate Dean. Vice-Provost said she understood two issues. One was academic issue due to Professor did not follow her syllabus that recorded my final grade lower than I earned. Second issue was to request for solution about Professor's bad behaviors

9

toward me and Professor treated me different from other students in my class Pathophysiology. I also requested for reimbursement my tuition for class pathophysiology. I gave her the reasons for getting reimbursement. I also explained an example like the airline service, if they did not provide service as they promise. The airline will compensate to the customer by voucher and/or given discounts and/or refund. This may happen to you or someone you know about airlines live up with their services and promise. It happened to me when the airline delayed and I missed my next connection. They put me on the next available fly and gave me a voucher of food and discount. I did not know these compensations policy during the events happened, but they just offered me for what they think it is the right things to do for their customers. Then vice-provost stood up and walked out of her office. I did not see vice-provost came back. I sat alone in her office for a while; I then gathered my winter jacket, bags and walked out her office. I saw vice-provost standing in front of main door and as I opened the door to walk out the hallway.  Vice-provost followed behind me with my help holding the door for her. Vice-provost did not say any word for the reason of our meeting ended or any excuse if she needed to walk out her office as well as main office. Vice- provost just walked straight out. I believe the action of vice provost did not show up for the first meeting was retaliatory versus non-retaliatory reason, because vice-provost knew all what went on during my process of complaints at Health Science (HS) Department to the Chair, Associate Dean and Dean. Vice-provost knew I did not accept their solutions to move on and now was in her responsibility to deal with my complaints.

Z.  The evidence showed in Dr. Girvan's email January 28, 2010 "...*After discussing your situation with Dr. Sharon McGuire from the Provost's office, both of us feel that you should work through your future coursework needed for the degree with your adviser...*" Her action of walking out in our second meeting was humiliating and retaliatory against me again for continuous coming to her office for filing complaints and requests remedy.

AA.     After months long to deal with the complaints at health science faculties and Vice-provost, Ms. Lee told me I should request another meeting with new dean of department, Tim Dunnagan. It was good idea to have new Dean in the meeting, said Ms. Lee. Vice provost, Sharon McGuire showed the pattern of her behaviors toward me again in August 2, 2010 that "...*I mentioned Dr. Toevs because she was previously associate dean and had been involved as department chair in your case...*" It was out of context and Ms. Lee told me that Dr. Toevs was the chair of HS Department and not just involved as department chair in my case. As Dean HS Department office and Dr. Springer,  Assistant of Associate Dean confirmed in early, but here was vice-provost's email that stated conflict.  Vice-provost broke

**10**

BSU's policy of values as the foundation for a civil and free from discrimination, harassment, threats and intimidation that stated in the University of Shared Values. I was deeply in emotional distress to see vice provost continuing retaliatory and humiliating me for filing complaints at her office since Feb.

BB. I continuously searched around campus to see another office that I may find some help. In consequentially, I received the invitation to participate the international student discussion at lunch one day in March 2010. I came and saw vice-provost there as well as Leslie Webb, Provost, Francisco Salinas (Director of Student Diversity and Inclusion) and Michael Laliberte (Vice President for Student Affairs). I sat the same table with Leslie Webb and Francisco Salinas. Mr. Salinas asked me how my experience at BSU. At that time, I did not know I should share my stories with him or not. I just responded that it was bad experiences. He encouraged me to share the story with him during luncheon meeting, but I did not want at that minute. Mr. Salinas then gave me his business card and told me if I needed some help, felt free giving him a call. I chatted with Leslie Webb a little bit. That was I knew Leslie Webb. The end of luncheon meeting, I saw Vice President for Student Affairs took few appointments with other students. I decided to make an appointment with Vice President for Student Affairs, Michael Labiberte. On the morning of the day of our appointment, his assistant, Stephaine Neighbors called me to cancel my appointment. I contacted Mr. Eckles' office for meeting. I met Mr. Eckles few times from April to June 2010. Mr. Eckles advised me to write all issues down instead of oral speaking. Mr. Eckles also referred me back to see Sharon McGuire because it was out of his responsibility, said Mr. Eckles. Mr. Eckles also suggested me to see Ms. Holy, Director of Affirmative Action who retired in a week, warned Mr. Eckles for discrimination complaints.

CC.      By July, there was no solving was given for my complaints. I kept going back to see Ms. Lee and she gave me Provost' office number and told me to call Dr. Sona Andrews. (I still have her notes) I called Provost's office on July 7, 2010 for making an appointment to see Provost. Danielle, Provost's assistant took my number and said she did not have Provost schedule in front of her and would call me back for scheduling appointment. I did not hear anything from Danielle. I stopped by to see Ms. Lee next day (Thursday, July 8) and this time Ms. Lee said I did whatever the university's procedure directed me to do in six months, now I needed to do formal filing. Ms. Lee took me into another office in President of BSU's office. Ms. Lee told me waiting for her to get the Academic Grievance Form for "filling formal complaints" (her words). Ms. Lee searched a while but could not find them. Ms. Lee told me to follow her into the Provost's office. Ms. Lee talked with Assistant of Provost; Judy at the front desk saw us, and walked into vice-provost's office and let her know that Ms. Lee and I were here. Vice-provost approached Ms. Lee and I in a

second later and said in angry voice to Ms. Lee that why she took me in here. Ms. Lee said "my complaints should not take this long; Mary needed to file formal complaints now and Mary needed academic grievance form." Vice-provost turned to me and asked if I had a few minutes to come inside her office for discussion. Before Ms. Lee turned away, Ms. Lee told vice-provost promised to give me a form today. (This is a true if needed, please ask Ms. Lee) Ms. Lee left the Provost's office and I walked into vice-provost's office. In the first few minutes, vice-provost said she acknowledged I phoned the Provost's office. Vice-provost then said if I would like she could fire Professor if I agreed. I remember clearly that vice-provost pressured me very hard to answer her question. I did not know what to say or believe it after these months dealing with her. Finally, vice-provost did not hear what she likes, then said I now went to fight for myself, and I had to wait for her to "make a new form for me" (her words).

DD.     Vice-provost promised sending the form to me by Monday July 12. I checked my email and did not see anything, so I dropped vice-provost email on July 13. Her response on the same day was that *"Mary, I am still gathering some information. I hope get back to you tomorrow. Sharon"* By Thursday July 15, I still did not hear anything from vice-provost. I dropped another email" *I am in the campus this afternoon. Please let me know if it is available for pick it up. Thanks. Mary"* I went to the library and found out Leslie Webb's office. I stopped by her office and let her know what vice-provost said to "make a new form for me". Leslie Webb shocked and surprised at the same time. Leslie Webb would not believe what she heard and said the form always in her computer for many years since she worked at BSU. Leslie Webb said she could print it out for me now. She just clicked and handed it out to me in a second. Leslie Webb, who always handle the academic appeal process since 2004-05 when she started to work at BSU, Leslie Webb said. Its evidence from Leslie Webb printed the form out to me in second in her office versus vice-provost needed to make new form for me. It indicated her actions of retaliation against me for pursuing complaints.

EE. Vice-provost's email July 15 stated, *"...there are two parts to the concerns that have been discussed. One related to your grade in the course and one related to how you feel your were treated by Professor Osgood. As I expressed after you and I met in December and February,....that grade has been change. Regarding your feelings of being treated poorly, you have participated in the protocol/procedure common with situations where students feel an interaction or situation is of concern..."* It confirmed once again that vice-provost as well as faculties at the University knew there were two issues of my complaints, when I came to their office for filing complaints. They understood well my issue of filing complaints, but BSU response and other emails at later time they said I did not know and realize my

**12**

discrimination issue. Evidences are overwhelmed for showing faculties from Boise State University was discriminatory, humiliating, retaliatory, and profound unlawful.

FF. On August 3, 2010, Stephanie neighbor arranged the meeting with vice provost, Dr. Tim Dunnagan and me at vice provost's office. I came to meeting and Judy told me to wait for vice provost since she had meeting with someone else in her office. Later, vice- provost came out and told me to come inside her office. Dr. Tim Dunnagan was there. During the meeting, I told vice-provost that she was disrespect me when I came to her office in previous months. Vice provost admitted and said sorry for her disrespect toward me. At the same time, I mentioned my internship credits issues. Dr. Tim Dunnagan took my paper and said he would look into it.

GG. I also wanted to mention about Dr. Dunnagan asked me *"why I hated Professor. Professor Osgood had a good record of the best professor in the department."* I responded that I did not hate Professor. I would not accept her bad behaviors toward me throughout semester. I wanted to comment on Dr. Tim Dunnagan's statement. As a student for 4 years at BSU, many professors said the university policy was not allowed professor to stay in the class or collected student survey during giving survey in the classroom. My many professors often said they would not allow to be inside class during students wrote their survey, they needed one student volunteer to bring the package to the main office of that department. I sometime volunteered to hand the survey out in the classroom and collected it after everyone/students finished and brought the package to the main office of the department. However, in Pathophysiology class was completely different, I never saw in any class in my whole time at BSU. Professor Osgood handed the survey to each student during the class and Professor stood there waiting for everyone to finish. Then Professor Osgood collected it row by row in organization method. I was surprised and did not want hand it out to her. Professor said I could hand to her later in her office. Professor Osgood broke the university's policy and rule and HS department did nothing. Maybe that reason Professor had a good record and became the best professor in HS department. In 2010, I saw the school news stated that the university surprised this year HS department did not have any professor selected for the best professor of the year.

HH. I also met director of Affirmative Action, Jane Buser first time at her office on August 5. After hearing my complaints, Ms. Buser told I should file complaint against vice-provost for retaliation against me when I came to meet her at her office. Ms. Buser also stated on email September 10, 2010, *"...there is not a full*

**13**

*committee as appointments are still being reviewed for this academic year. Also, it has been our experience that it takes considerably longer to schedule meetings with the entire committee ( sometimes months) and thus delays the process...)* and said she was no rush and I took my time to write all down for filing complaints with her. Ms. Buser also told me that she asked Associate Dean took some action with Professor early and Associate Dean sent professor to culture classes in August/Sept/October months. Ms. Buser gave me a copy of letter from Associate Dean. (Please see in attachment) I also met Leslie Webb few times, and she helped me to finish drafting papers of filing complaint on November 29, 2010.

II. On November 29, 2010, after finished my class at 10:40am, I walked to HR Affirmative Action office to submit my written filling. The woman at the front desk told me to wait for her to speak with Ms. Buser, Director of Affirmative Action. The woman returned and said Ms. Buser did not want to see me. I needed to see someone else. The woman did not explain the reason. I was shock and cried with feeling being humiliate from the faculties at Boise State University for eleven months now (Jan 5 to Nov 29). Debbie Alvord and Andy Cover approached and told me to tell them about what happened. I just gave them a little summary of my complaints against Professor Osgood. Andy warned me that the university would not fire tenure professor and I should not expect for it.. Andy saw I hold the papers of filing. Andy then insisted me to hand my papers to him, and I did not. That was the time I left the university and drove to Idaho Human Right Commission for filing my complaints.

   **2. Summary of my HLTHST 480- Epidemiology with Hannah Lee and Sarah Toevs-chair of department was retaliatory against me when I came to her office January for filing complaints.**

A. I really did not want to take any health science class in College of Health Science building after the issues with my previous HLTHST 300, but I had no choice and had to take HLTHST 480 class to qualify for graduation. I took Epidemiology class (denoted HLTHST 480) from Professor Hannah Lee in fall semester 2010. There was a total of sixteen weeks during semester. Absolutely, I did not want to create any more conflict with any professor at College of Health Science. Therefore, I kept myself very little contacts with the Professor for the first 14 weeks. I thought I already had an issue with professor Osgood in the previous year at Health Sciences Department and was currently in process of filing complaints at the university with Ms. Buser.

B. At the beginning of semester, I found couple of classmates who was very nice to help me to contact Professor if any question I had and provided me any info needed for this class in the first 14 weeks. Unfortunately, the last week of lecture class I came to the professor's desk for a question "Total points". It turned out I

**14**

discovered and shocked from Professor's response that each student would have different total points for grading in assignments category. She did not know exactly what the total points for class were. She needed to check all her emails to know each student total points, said Professor. I followed up to see after she had a chance to figure out what were the total points for the class. After few emails to her without hearing back, on Saturday, December 11, 2010, Dr. Hannah Lee sent an email " *Dr. Tengelsen and I are meeting tomorrow evening (Sunday) to finalize the final paper scores and then they will be posted on Blackboard. Blackboard should have the correct total points for the class as well.*" Professor never posted, even semester ended.

C. On December 13, 2010, it was our final exam. I came to class early and teacher assistants handed it out essay papers and assignment back to the class but would not find my papers and assignment. Teacher assistant told me to wait for Professor came in later the night. By the end of the night, after handing my final exam to teacher assistant, I received my essay papers with harsh grading from Professor's comment "minor errors" with deducted twenty-five percent of grading. I expressed with Professor and she could not believe what she wrote. Professor wanted to look at her comments and then changed to deduct fifteen percent versus twenty-five percent deduction early. Other parts of my essay were harsh grading compare with other students during waiting for Professor came in late. One example, Professor's comment on my friend's paper who sat next to me that repeated too much information and subtracted only five percent.

D. Professor also told me she "lost" (her word) my assignment papers. Professor asked if I handed it to her. I confirmed that I handed it in the class with my two classmates who sat on my sides. We even discussed the assignment question before passed it along our table for her collect. It was the way Professor collected our assignments during semester. My classmate waited for me outside the class at that time if Professor needed witness. Professor said I could re-do the assignment. I responded that this was the first final class in the final week. I had a lot of study for my other classes. Professor said she understood. Then teacher assistants said they could go back to their home to look for my lost assignment. Professor added that she would look at her office and let me know a day or two later. That was reason I waited for their answer if they found my lost assignment or not during the final week. Professor never mentioned again that I should re-do or offered me to receive class average grade as Professor mentioned on April 211 statements.

E. Last day of semester, I still did not hear responding from Professor and teacher assistants. I then sent her another email:" *Dear Dr. Hannah, after I sent you early email, I check my broncoweb. It is indicated that I have B-. I wonder how you come up with B- when you told me last Monday (12/13) that you lost my assignment and will look for it and let me know on next day. Until Friday (12/17), I did not hear from you at all, and then I stopped by your office to find out if you find my papers yet. Unfortunately, you are not in your office, and then I left you a message on your phone. I hope you can let me know what is going on. I am not even hearing from you until few minutes ago I check my email. You are again asking me the same question*

*last Monday. I told you that I handed my assignment with hard copy at the class on the due day with my classmates around our table the same time. Plus you are not record my essay grading correctly after you changed them on last Monday. Now you already determined my grade. Please explain. Thanks."* On December 20, I received Professor's email *"... Thanks for the follow up email. I did not have good internet access over the weekend. The reason I posted your grade without following up on Article #2 was because if you made a 0 or a 25, it did not change the final outcome. Your original homework score, without the 25 points, was 81.9%. When I added in the 25 points for Article #2, it changed the homework score to an 86.3%. Below are the scores with and without the 25 points added and they are both B- so I decided just to give you the 25 points for article #2 since at this point the TA's are both saying they don't have it. It seemed easier than "arguing" about it. I will add the 25 points back into Blackboard tomorrow. I hope this answers your question..."*

F. Now reading the FOIA on paper 30 showed conflicts information between Professor's email and her statement date April 8, 2011 *"..Ms. Joseph scored a 52% on the first article critique. I thought the offer to allow her to re-do the second critique (for possible full credit) or take the class average of 80% was generous and it would have allowed the grade to become a B if those points were added...We re-caluclated the final score with the additional points but it was still a B-. I did not ever make a change in one of Ms. Joseph's grades except to add the extra points onto her final paper score after our conversation. I know that the timing of our email communication was during a difficult time, after finals when I was trying to get everything graded and final grades..."* It again showed the conflict and incorrect/untruth information such as I did not score a 52% on the first article critique and Professor never offered to take the class average of 80% at all. Now she stated in Grievance complaint B. It was completely out of the truth. Evidence was clearly in her email (12/20) that she agreed to give full credits (25pts) and will add back into my blackboard tomorrow. Professor also admitted she changed on my essay paper score after we had conversation, but Professor still did not record her change that could change my grade higher as she said. The university's policy 3130- B on grade appeal stated clearly that grade appeals will be considered only when... that one of the following has occurred: The instructor violated a specific university rule or policy pertaining to grading, or the instructor refused to correct a clerical or administrative error made in the process of recording or reporting the grade..." My appeal was qualified for their requirement and should have merit to it, but they did not follow the policy. There is not only BSU professors did not carry the professional and ethical in the America education system, but the university did not comply with its own policy that stated. It is unlawful.

G. I still did not know what the total points for our class, so I sent an email to everyone if they knew the total points. I received Steven and Sherri Stanley and Cynthia Clinkingbeard's email that showed how the professor treated me different from other students in the class. Steve and Sherri Stanley sent to me on Dec 27, 2010 *"... Anything I needed she was there to help. I thought she was awesome and really knew her stuff. I have taken classes from other professors that were not any*

**16**

*help at all. In fact, one professor in my M143 class Merla Lloyd told all of us if we needed help not to ask her because she was too busy. So, Dr. Hannah always responded to my emails in a timely manner and I even talked to her on the phone for 30 minutes to get help on an assignment..."* and from Cythina 's email *"... Dr. Hannah has a complex grading system..."* Her comments were very nasty. I also heard the news that Cythina Clinkingbeard's behaviors involved at Staples' store this year. Cythina was in jail for her behaviors. It was strange that I found out Cythina became adjunct professor at health science department and taught class pathophysiology in Spring 2011 that Professor Osgood taught in previous semesters.

H. This was the way Dr. Hannah treats other students except me. It was not only the professor treated me different from other students, but Professor also was not carried the ethical standard of professional in the university's policy. Professor still did not respond to my "Total points" question in November to the last day of semester. In additional, Professor miscalculated my final grade and found out later in the Chair's office, but she still did not record the correct grade. Leslie Webb noticed this pattern from Professors at College of Health Science that Leslie Webb wrote down the remedy for *"diversity and training requirement for Dr. Hannah and Health Sciences faculty"* when I came to her office for filing appeal in March 2011. (Please see copy info enclosed)

I. Sarah Toevs, chair of department arranged the meeting with Professor Hannah Lee and Dr. Tengelsen (on the phone) and me on January 2011 at Sarah Toevs' office. As in Professor Hannah Lee email on December 20, that Professor agreed to give a full credits of 25 points of my lost assignment, but Sarah Toevs imposed me her actions of retaliation against me for coming to her office for filing complaints again during meeting, *"...Dr. Hannah confirmed that no grade was given because the assignment could not befound. You and Dr. Hannah spoke about this situation during finals week with Dr. Hannah starting the assignment could be submitted for grading or a zero (0) would be awarded...Action:Because the status of the lost assignment can not be verified...Drs. Hannah and Tengelson agreed to give you a grade for the assignment based on the class average earned on the assignment, 20 of 25 pts...I indicated that you would have until Friday, 1/21 to consider the option of receiving the class average grade for the missing/lost assignment..."* It showed completely conflict between Sarah Toevs' statement and Professor's email on Dec 20, 2010. Sarah Toevs just lie about that Drs Hannah and Tengelson agreed to give me a class average grade. It was her actions of retaliation against me to come to her office again for filing another complaint. Sarah Toevs knew my previous of filing complaint about Professor Osgood with her in year early and currently in process of pending at Idaho Human Right Commission. The end of meeting, Sarah Toevs also was not allowed Professor to change my correct final grade after Professor realized her previous mistake of calculate my final grade from B+ to B-. It also was her changing grade of my essay paper on Dec 13 and helped Professor destroyed the evidence of total points for class. (Please see more details in letter) I would like to mention Sarah Toevs letter on Monday, April 11, 2011 on FOIA records that '...

*Dr. Hannah was awarded tenure and promoted to Associate Professor by her peers in 2010...Sarah Toevs had agreed to give Ms. Joseph a grade for missing/lost assignment based on the class average earned on the assignment. Ms. Joseph declined this option stating that she should receive full points for the assignment..."* Sarah Toevs said she gave me the class average (20pts) for coming to her office for filing complaint. It was definitely her act of retaliation against me, since Professor already agreed giving me 25 points. Its evidence shows violation of Title VI of the Civil Rights Act of 1964 for retaliation against me during the processing of filing complaint at her office.

J.  I then filed formal complaint Academic Grievance Appeal through Leslie Webb's office. Leslie Webb told me copy her written for remedy in the appeal. (I have her hand written note for this. Please see in copy enclosed). There were few conversations between March- April 2011 between Leslie Webb and me. At the end of April, Leslie Webb said my appeal would procedure on May 4-5, 2011 under her office. Unfortunately, my family had emergency that I needed to leave the country for two weeks. Leslie Webb said I needed to be there for answer the committee board questions. Leslie Webb said we could wait to fall semester 2011 for appeal if I was not here. Leslie Webb promised would be the same procedure in the fall semester. With my experiences from previous complaint, Leslie Webb was helpful for providing me information that I needed to know in the procedure/rule at the university. On June 7, 2011, I checked my email and called Leslie Webb about receiving Sharon McGuire's email (date June 3) for rejection my appeal. Leslie Webb expressed surprise and asked me the permission to allow her to investigate into the reason why rejected it. After period of investigation into it, Leslie Webb found out something was going on that made her sent me emails on Aug 16"...*the answer wasn't given ..." and "... I am not able to help you any more on THAT only. I AM here to help you on anything else..."*

K.  Leslie Webb's email on August 24, 2022 sent to me from Sharon McGuire's email (Aug 10) confirmed that *"Mary's summary of how the 'missing assignment" was considered is accurate to my knowledge...The grade appeal criteria does not include how stress might have impacted academic performance so was not considered by the preliminary panel. Let me know if you will share my response or if you would like another course of action. Sharon"*, but in the committee board of my appeal process stated that I turned in late and Professor gave me her *"generous of class average grade"*. One committee member- Professor of Literacy-college of education said in Freedom of Information Act (FOIA) recorded that "he/she rejected my appeal because I handed it late that was the documents were provided to him/her." It was similar to letter from Associate Dean on April 19, 2011 "...*Ms. Joseph stated that the syllabus says assignments are not accepted if they are late...."* This was untruth and lie information. I do not know where her statement came from. I did not have handing late assignment. Professor admitted she lost my assignment, and it also confirmed by Sharon McGuire's email. Letter also stated "... *I do not believe this issue affected Ms. Joseph as I am unable to see where one of her assignment was turned in late and not accepted. I requested clarification on the change in essay*

*grade...Explained the 25% to 15% related to the grading rubic. Her paper grade was actually increased 2 points...I am denying the remedy sought by Ms. Joseph...there may have been some miscommunication..."* Evidence speaks itself.

L. There is few more untruth or lie information that recorded in the package. On page 60 FOIA stated course instructor (Dr. Hannah), Chair (Sarah Toevs), Associate Dean (Dr. Springer), Assistant Vice President, Student Affairs, and Vice provost for undergraduate Studies were involved in the grade appeal determination. It was once again conflict of information between these statement and Leslie Webb, assistant vice president Student Affairs told me that she did not know my appeal reject and investigated into on June 7. The individuals involved for determination on my appeal was the faculties I filed complaint against and now sat on the position to determinate my appeal. It created the conflicts of interest and the result of my appeal was not fair. The university did not provide adequate information to the board member that was caused them to reject my appeal. On page 73 FOIA record stated from Professor and Department Chair of Criminal Justice Department that *"...the only thing I can tell you is that I noticed the policy changed in May 2011. The other case I previously served on was in December 2010, so I don't know other than that. It was done under the old policy..."* It showed the vice provost/provost office changed the policy to control my case, since appeal process would go to Leslie Webb' office. This info helped confirm Leslie Webb surprise the policy change without notice until August. Leslie Webb confirmed me before my appeal decision to defer until fall semester that the policy will be the same. That was why I made decision at later time.

M. On page 76 FOIA, evidence of Professor of Literacy in the College of Education statement showed the Provost's office did not provide adequate and full information for my lost assignment and Professor Hannah's email (12/20) for senate faculty to think that I handed assignment late. It was mis-lead info that affected senate faculty's decision. Again, Professor of Literacy who was a member of the senate faculty for 6 years as well as Vice Provost for Academic Planning, still did not know the change of grade appeal and grievance appeal separate in May 2011 as the university claimed. Once again, the university tries to cover, protect and encourage of faculties of wrongdoing. It is unlawful. (Please see more detail in letter enclose and if more info needed, please do not hesitate let me know)

N. I did not know where to find any help at the university as well as at Idaho Human Right Commission who told me they was not even started my case yet and I needed to wait. I contacted Office Civil Right and filed my complaints. During the Office Civil Right investigated and obtained some information from faculties at the university. I was being able to request the information through Freedom of Information Act (FOIA). It was shock and surprise for me again to see the pattern of behaviors that the university tries to cover, protect and encourage the faculty of wrongdoing. The university did not comply the rule that state in their policy. Even today they recorded my grade B-.

**19**

### 3.  Summary of my internship credits with my adviser, Glenda Hill

A. The first time I came to Boise State University (BSU) 2005, they assigned me to my adviser, Glenda Hill. She was only my academic adviser throughout many years until spring semester of 2010. She and I had a good relationship throughout these years (I thought). Every year during holiday season, she always received my gifts. I saw her at least once during each semester. Glenda Hill often told me to take particular number credits or class for graduate qualification from each semester. I followed her advice, but in spring 2010 meeting, Glenda Hill told me she calculated wrong the number credits in previous meeting and I needed to add extra two more credits for graduate. I believe this time she found out her own that she forgot to sign my internship form. That was why she just said she calculated wrong instead of letting me know the truth was. She knew I worked toward to pre-pharmacy major and degrees. For many times in appointment, she often told me that pharmacy program is very competition, I needed to do volunteer work at the pharmacy setting in order to compete to get in, even though some school may not require any experiment.

B. I worked so hard for long time to find a volunteer position in the Treasure Valley. It was not easy to find volunteer position at pharmacy setting. I finally got accepting for volunteer job at pharmacy setting at local hospital. I shared with Glenda Hill about my journey of finding as well as my job position during over this period. Glenda Hill expressed her happy and excited for me. Glenda Hill even reminded me in spring 2010 that she recalled to see my excitement in her office. Glenda Hill told me that I could get credits for my internship during worked at hospital. Glenda Hill said that I would receive internship credits when I apply for graduate. Then the time I applied for graduation in spring 2010, I found out Glenda Hill "forgot" to sign on my internship paper for receiving credits. Glenda Hill said she "forgot" (her word) to sign and handed my paper to register office in appropriate time.

C. I worked with Glenda Hill to see if I would still obtain for my internship for graduate. First meeting with Glenda Hill in January, she said I could not. Then one day during visiting the registrar's office, I found out that I would be able to receive my internship credits. The registrar' office printed the form out for me and directed me to see Glenda Hill. I went to Glenda Hill's office and she rejected to sign the form. I went back to registrar's office and back to Glenda Hill's office few time before Glenda Hill accepted sign on the form on February 23, 2010. Glenda

**20**

Hill directed me to give my supervisor for her signature too. I followed her direction and submitted to the registrar's office(Please see copy enclosed)

D. I submitted my internship form to registrar's office on Feb 23, 2010. After my class one week later, I stopped by the registrar's office to see if my application went. Steven and Rohsan Ames told me that they rejected me application for receiving credits in this semester, because the office knew what happened for my internship credits. They said they thought Glenda Hills let me know right after I submitted the form. Steven and Rohsan told me I should talk with Glenda Hill tomorrow. I was surprise. Next day, I came to Glenda Hill's office; she said she got a call from Steven and Rohsan about my visiting yesterday. Glenda Hill told me why I came to registrar's office, and now they knew and rejected my application.

E. Rhosan felt bad for my situation and suggested I should file the appeal to receive my internship credits. Rhosan directed me the procedure of filing the appeal for internship credits. I followed the procedure of appeal. I filed appeal at registrar's office in March. By March 24, 2010, I received a phone called from Kris Collin that they could give me two credits if I agreed to pay $504. Another surprise was now I had to pay $504 for receiving credits that no one told me before.

F. I contacted with registrar's office again. This time, the registrar's office printed it out the Prior Learning Credit form for me and directed me to see Health Science department for their signatures. I contacted the department.

G. Recall above. I met Dean of department, Tim Dunnagan on the meeting with Sharon McGuire on August that suggested from Ms. Lee. He took my appeal paper and said he could help me to obtain internship credits. I went through the process of obtaining my internship credits as each office directed, but each time I came to registrar's office and they told me different things from directing me to fill out the internship form to file appeal to the Prior Learning Credits filing. Not only at registrar's office, but at Health Science Department was the same. Tim Dunnagan told me to contact registrar's office or Sarah Toevs' office to obtain credits after his contact with Kris Collin in registrar's office. I came the registrar's office they told me different each time. Then Angela, the assistant of Sarah Toevs' office called me and told me Sarah Toevs' office dealt with my issue only. I told Angela that Dean's email said I contacted either registrar's office or the Chair's office for obtaining credits. I read to her Dean's email and told her that I preferred to contact registrar's office since the Chair was retaliatory against me early and I currently

**21**

filed complaints against her. I did not want to deal with her any more. Angela told me the Chair wanted me to take online course through Idaho independent study to obtain my internship credits with under Sarah Toevs supervision. It was ridiculous. I already went through hundreds of hour's internship and now told me to take online in the different class to obtain my internship credits. The evidence showed the university broke and out of control. (Please see more detail)

F. I still did not receive my internship credits to qualify for graduate, so I took class at University of Montana Western to obtain credits for graduate in May 2011.

**My case at Idaho Human Right Commission from November 29, 2010 to May 2012**

A. After Ms. Buser rejected on Novermber 29, 2010. I drove immediately to IHRC's office for filing complaints. My first two months after filing complaint at Idaho Human Right Commission (IHRC), I worked with Mr. Anderson. He missed placed my personal information to someone else, and I received someone else personal information. It was weird and unexpected it!

B. I also worked with Ms. Goodman for few months until April 2011. It was frustrated for me to go through the chain commander at Boise State University for eleven

22

months during my filing complaints. The treatment was discriminatory and profoundly humiliating and unlawful from faculties at the university. When IHRC assigned Ms. Goodman to my case, I was happy to work with her. Ms. Goodman informed me by email and/or called during her investigations my case. I knew where status of my case was. Moreover, I was able to arrange the meeting with her one time to discuss info that Ms. Goodman wanted to clarify. Occasionally, Ms. Goodman also suggested me to call if I had any questions or concerns. During that time, similar things of discrimination and retaliation happened again to me with Health Science 480, I was comfortable to call her and let her know what had happened. Ms. Goodman was able to give me some advises that was value and helped me applying through this process. As you know, I just a student with science major and did not know much about the legal field. It is nice to have someone like Ms. Goodman that I can trust and comfortable to ask questions about my case in the government agency who presents the Idaho people. Ms. Goodman often informed me (Complaint) as well as BSU (Respondent) about the rules and procedures of the IHRC. Ms. Goodman sent her email to both of respondent and complaint and let us know to feel free to respond each other about agree or disagree info. Ms. Goodman said I have "small case" and we discussed the mediate process. Then in the end of April, I received an email from Ms. Goodman that my case now transferred to Mr. Burlile, since the mediate process was not preceded from the university at this time. Ms Goodman suggested I should call Mr. Burlile to see my case standing.

C.  I took her advice and I called Mr. Burlile on May 19, 2011 (at 11:15 am). I received a cold, unfriendly and snapping answer from Mr. Burlile. I needed to wait for three months for him to start to investigate, said Mr. Burlile. Mr. Burlile told me called him back in three months. That was basic our conversation on May 19. I feel it will be long journey to deal with my case at IHRC. I started to patient and followed exactly what Mr. Burlile told me. I recorded every our conversation for records because I am too tired to believe people in here will be honest as they always say to other people but themselves and blame on me saying I am mis-communication with their excuse due to language or culture. This was a value advice I got from this process.

D.  I called Mr. Burlile back on September 22 at 4:30 pm. Mr. Burlile said " *he was not even start my case yet, it would take another three months for him to start since there were twenty cases in front of my case and are important than my case.*" I was shock to hear his response. That was all of our conversation. I talked about it to Office Civil Right investigator. After receiving the full copy of my file on April 13, 2012, I found out that Mr. Burlile did not inform me about receiving the respondent's statement on May 25 as well as let me respond back to their statements the same in previous investigation under Ms. Goodman. I thought it is not a message I read in IHRC website "Respect for the principles of civil rights laws and Respect for all the people with whom we deal."

23

E. Therefore, on November 30, 2012 at 12:00pm I called Sara Nichols- administrative assistant. Sara took my message and said Mr. Burlile would call me later. I did not hear anything from Sara or Mr. Burlile for couple of weeks. I then called Sara again on December 14 and let her know I still did not hear anything from Mr. Burlile about my case. Sara sounds surprise.

F. My decision this time stopped by IHRC office instead of calling again. I stopped by on December 15 and requested to meet Mr. Burlile. I met Mr. Burlile at his desk. First, Mr. Burlile said he did *not even start my case yet* (again) because my case was in education if I have to wait I do not *lost any income* compare with other cases he worked on. If he had to put other workplace case waiting they would lost their income. I had to wait, said Mr. Burlile. I could not quiet any more. I told him it was not right for him to say because your reason of my case was in education vs. work place. Mr. Burlile then shift to another question: why did I file complaint about Sharon McGuire who was retaliatory against me and professor Osgood was discriminatory against me. During this visit, Mr. Burlile said he did not see retaliation from Sharon McGuire. I would like to mention that Mr. Burlile made this decision few months (June-Sept) before with Office Civil Right, but did not inform me at all. I saw in a copy from IHRC's file in April 2012 too. Mr. Burlile also said he just thought Osgood was "RUDE" (his word) to me. I explained to him why I said that and gave him evidences and reasons in the filling too (Ms. Parks was there with us after hearing our previous conversation/debate). I also argued that if you said "RUDE" so why the university did not do anything about her behavior "RUDE" toward me during semester when I came to the chain commanders for complaint. At the same time, BSU stated in their response that BSU gave professor Osgood tenure in March, which was during my filling complaints. It is not accepted behaviors in the education environment. Mr. Burlile could not answer. Mr. Burlile then went on to tell he is Boise State University alumnus. He knew the university.

G. Ms. Parks listened to our conversations in his office. Finally, Ms. Parks said that Mr. Burlile would start my case tomorrow. Ms. Parks also confirmed her decision with me in Mr.Burlie's office by sent an email to me on Dec 16, 2011. After left Mr. Ernie Burlie's office, I feel so concerns about the fairness of outcome during his investigation on my case, since Mr. Burlile said that is BSU alumnus and few conversations with him through the phone from May-December. On December 16, I called the main office, and assistant who answered my phone told me my case was not yet start, I was able to request changing different investigator. She then forwarded me to left message for Ms. Parks. I requested Ms. Parks to assign different investigator for my case. I expressed my concerns of the conflict interests as investigator. Ms. Parks rejected my request.

H. On December 22, Mr. Burlile called left message for me and said he interviewed me next day at 9:00am. By 7:45 am on December 23, Mr. Burlile said he was out of town and returned next Tuesday. Mr. Burlile did not let me know when he would

**24**

interview me. Mr. Burlile just called and interviewed me on morning December 28, 2011 for 14 minutes while I was driving on the highway. I asked if he would allow me to pull my car on the side of the road for his interviewing. Now in IHRC summary of investigation on page 11 stated, *"Complainant was interviewed at length. Complainant failed to provide any evidence that she was treated any differently than non-Asian students. Complainant was asked if any other students had been allowed to take the test a second time Complainant said "No."...When asked why she specifically felt that she had been discriminated against complainant said, "Because Linda Osgood had not kept a scheduled appointment with her." In additional information in your package sent to me with handwritten from Mr. Burlile.(Some is hard to read) One example of his hand written that "Mr.Burlie you not a good invest(igator), you tell me you not going to do my case-now you tell me it will be done in 24 hours..."* These are crazy statements without common sense. Asking yourself when reading, it makes any sense with my answers as Mr. Burlile and IHRC reports in summary of investigation. I did file in my filing that professor allowed several other students to take the test later, even the university agreed in their response statement. Did you believe I really answered these questions as it stated above? It was completely out of the true with these statements. I learn through this process that one does not take my word; I then need to back my evidences of our conversations. Evidence of the truth will speak itself to one who has to see to believe. I also found out in the copy file that I received in April 2012 that Mr. Ernie Burlie received the respond from Ms. Henken at BSU on May 25, 2011, but Mr. Ernie Burlie would not let me know and allow me to respond back BSU's statement. Now in IHRC summary of investigation stated that I failed to provide any evidence. Looking back on my notes during the time Ms. Goodman was my investigator, I and BSU both received emails from Ms. Goodman and she let us feel free to respond to each other if something agree or disagree. Mr. Ernie Burlile was not only fully informing information to me but also treated it unfair between me and respondent. Mr. Burlile did not follow the IHRC policy like Ms. Goodman did during investigation in early stage. Investigator who presents the Idaho people with their authority at IHRC on my case, but he was failing to follow the IHRC value as indicated in their statements.

I. With all info above, this is not courteous and professional that present Idaho people at IHRC. Another example, on Wednesday, April 4, 2012 I sent an email to Ms. Parks about requesting to obtain the full copy of my file; I did not hear back from her, so I called and left her message on Thursday, April 5. I still did not hear anything from Ms. Parks. I stopped by IHRC's main office at 4:10 pm Friday (April 6, 2012). I met Ms. Sue and front desk lady (not Sarah). I let Ms. Sue knew because I did not hear anything from Ms. Parks, Director, after left an email and message. I thought it was a strange because she usually had good responded. Ms. Sue said "Ms. Parks was here in her office all day and was not here now". They asked me to leave a note for Ms. Parks. By that Friday night (4/6), I received Ms. Parks's email stated that " *I am sorry I have not back in touch with you. I am home ill right now...*"

25

I do not know what to think as well as whom I should believe to and why info between professionals at IHRC conflicts.

J.  IHRC did not adequate opportunity to present my position fairness instead favor the Respondent. IHRC did not state completely my major information that described the evidences of discrimination and retaliation from professor and Sharon McGuire that I submitted. In addition other information from the Respondent in the report were conflict with my information provided, but IHRC was not investigate into it to see which was the truth vs. not truth/lie info or discrepancy between the Respondent statement or giving me the opportunity provide my response to the respondent. One example, in IHRC summary of investigation on page 6 stated that "...*In follow up, Dr. Springer suggested that Complainant bring a written statement summarizing the remedy she was seeking to prevent further miscommunication.*" My filing submitted to IHRC was that Dr. Springer suggested I wrote my questions to be answered by professor Osgood during our meeting with the Chair and professor at Dr. Springer's office.  I did bring my written questions in typing two papers to the meeting for preventing MIS_COMMUNICATION that they blame on me, I have these evidences but had no chance to respond back or provide these evidences to Mr. Burlile. Other example, the Respondent stated the info about my question exam #5 was completely discrepancy between their statements to IHRC and in the email that sent to me from professor. I have her emails to prove these untruth and discrepancies. Again, Mr. Burlile did not let me know and I could prove their conflicts statement. Even with that, IHRC believe the Respondent info was corrected without considering to my position. IHRC also did not allow me to respond back to the respondent's statement.

K.  I am so disappointed for investigation at IHRC. I went through the process at BSU, and being pushed to see one to another around campus for 11 months. At the end of November, I was being pushed again. I depressed that was why I came to IHRC for help. With all report of summary from IHRC, it showed that IHRC did not do investigate into both sides of the case and just favor one over other since investigator is the Respondent's alumnus.  IHRC committee reports my case without truly and accurate analysis information for confirming it is true or not from investigator. It allowed Mr. Burlile stated whatever information he wanted in the results of my case. That was what I concerned at the first conversation with Mr. Burlile and expressed more of my concerns to Ms. Parks on December 16. IHRC made decision on my case based on the information from Mr. Burlile provided without further investigate and accurate analysis of information. With process of my case was not ethical, professional and unlawful at IHRC.

L.  Looking at the record from Freedom of Information Act (FOIA), it stated on page 10 at last paragraph that "...*(IHRC) are investigating claims of discrimination based on national origin and race...investigation focused on BSU's treatment of C during fall semester 2009,- stated additionally, that IHRC also looked at an allegation that*

**26**

*occurred in Spring 2010, where C tried to get her grade changed."* This statement was from senior Investigator at IHRC, Ms. Goodman, but I received their results of finding on March 1, 2012 was not mentioned anything about this. IHRC even did not investigate into this allegation as mentioned to Office Civil Right. IHRC just said found no cause without conducted such investigation. It violated the Idaho Status Title 67, Chapter 59 Commission on Human Rights.

I received the letter from Idaho Human Right Commission on March 1, 2012 and director Ms. Parks' email that "I will need to do the court filing within 90 day period outline by the Notice of Right to Sue which is a part of the determination." I look forward to Federal Court's investigation of these maters and the opportunity to look for justice in America system. The emotional and physical distress that I have to deal with these complaints since 2009 have enormously affected on my health, education, well-beings and my family. My life changes forever since I took health science class 300 at Boise State University.

Thank you so much for your consideration. If the Court has any question or need additional information before reaching a cause determination, please do not hesitate to call me.

Very truly yours,

Thuy Joseph                                          Date: May 25, 2012

4536 N. Torridon Way

Boise, Idaho 8370

208-863-9667

27